RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

EL CAMINO RESOURCES LTD. and ePLUS
GROUP, INC.,

　　　　　　　*Plaintiffs-Appellants*,

　　　　　*v.*

HUNTINGTON NATIONAL BANK,

　　　　　　　*Defendant-Appellee.*

No. 12-1254

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:07-cv-00598—Janet T. Neff, District Judge.

Argued: January 24, 2013

Decided and Filed: April 8, 2013

Before: SILER, SUTTON, and McKEAGUE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** John E. Anding, DREW, COOPER & ANDING, P.C., Grand Rapids, Michigan, for Appellants. Jeffrey O. Birkhold, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** John E. Anding, Thomas V. Hubbard, Theodore J. Westbrook, DREW, COOPER & ANDING, P.C., Grand Rapids, Michigan, John A. Graham, JEFFER MANGELS BUTLER & MITCHELL LLP, Los Angles, California, for Appellants. Jeffrey O. Birkhold, James Moskal, Matthew T. Nelson, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION
───────────────

　　SILER, Circuit Judge. Plaintiffs, two computer-equipment leasing companies (jointly "El Camino"), entered into agreements with and were defrauded out of millions of dollars by Cyberco Holdings, Inc. ("Cyberco"). Cyberco's bank, Defendant Huntington National Bank ("Huntington"), accepted funds for deposit that Cyberco

1

fraudulently obtained from Plaintiffs. El Camino sued Huntington for conversion, aiding and abetting conversion, aiding and abetting fraud, and unjust enrichment. The district court granted summary judgment as to the first three claims, concluding that El Camino could not establish the requisite level of knowledge to sustain claims of aiding and abetting fraud, aiding and abetting conversion, and conversion. It later dismissed the unjust enrichment claim, which is not at issue on appeal. For the following reasons, the district court's rulings are **AFFIRMED**.

## I.

This case arises under the diversity jurisdiction of the court, 28 U.S.C. § 1332, and the parties agree that Michigan law applies. In early 2004, El Camino executed Master Equipment Leases (the "Leases") with Cyberco, a corporation held out to be a computer sales and consulting business. Unbeknownst to El Camino at that time, Cyberco operated under numerous names and was engaged in fraudulent activity. One of its affiliated corporations was Teleservices Group, Inc. ("Teleservices"), a shell corporation with no employees, assets, or operations. Barton Watson and Krista Watson, both principals of Cyberco, impersonated corporate officers of Teleservices using a number of different pseudonyms. To third-party leasing companies, such as El Camino, Teleservices was represented as an arms-length computer manufacturer and retailer.

Under the Leases, El Camino promised to lease certain computer equipment to Cyberco in periodic schedules throughout 2004. The equipment, which is believed to have never existed, was allegedly manufactured by Teleservices. El Camino therefore ordered the equipment from Teleservices pursuant to each lease schedule, and Teleservices then was supposed to have delivered the equipment directly to Cyberco. Upon each alleged receipt, Cyberco issued certificates of acceptance to El Camino, certifying that the items set forth in the particular schedule had been delivered. El Camino then released payment to Teleservices, which immediately transferred the funds back to Cyberco, allowing Cyberco to make lease payments to El Camino and ultimately completing the circle of fraud.

In 2002, Huntington established a comprehensive banking relationship with Cyberco. Just as Cyberco employees misrepresented Teleservices to third-party lenders, they also misrepresented the shell corporation to Huntington. Throughout Huntington's banking relationship with Cyberco, it received a number of contradictory representations concerning the nature of Teleservices, including descriptions of it as a client of Cyberco, an investment company owned by Krista Watson, a company owned by Barton and Krista Watson, a call center, and a computer vendor.

At the end of 2002, Cyberco made a series of significant overdrafts. Each time, Huntington personnel contacted Barton Watson or James Horton, President and CEO of Cyberco, who explained the problems resulted from checks that had been issued prematurely or unexpected delays in deposits on behalf of Cyberco's customers. Twice in 2003, Cyberco demanded a "hard hold" be placed on its automated clearinghouse account because it believed its security had been breached by a former employee. Huntington complied with the requests, and the two holds caused more than 20 overdrafts as well as Cyberco's receipt of a non-sufficient-funds ("NSF") check from Teleservices, drawn on the Silicon Valley National Bank, in the amount of $2.3 million.

Huntington employee Gail White was called upon to decide whether to cover the shortfall in Cyberco's account created by the NSF check and, as a result, began investigating Cyberco's account. She noticed large financial transactions, many of which came from Teleservices, and others which involved foreign entities in Pakistan, the United Kingdom, China, and Australia. These transactions caught her attention because she knew transactions to and from Pakistani accounts to be associated with money-laundering operations.

In October 2003, at White's insistence, a number of Huntington employees met with Barton Watson to inquire about Teleservices and its relationship with Cyberco. Watson provided conflicting explanations that further worried White. Afterwards, she told other Huntington officers that she suspected the NSF check was part of a "check kite," a scheme whereby a party "'writes a check in excess of his account balance in one bank, deposits it in his account in another bank and then reverses the process by writing

a check on the second account and depositing it in the first account.'" *United States v. Montgomery*, 980 F.2d 388, 392 (6th Cir. 1992) (quoting the district court). Based upon this suspicion, she began maintaining a Microsoft Excel spreadsheet of Cyberco's account activity and other data concerning both Cyberco and Teleservices.

White took her concerns to John Kalb, Huntington's regional Chief Risk Officer, in November 2003. She mentioned the NSF check and the large transactions showing movement from Cyberco's accounts to accounts abroad. She never mentioned fraud, but stated only that she thought something may be wrong with the account. Kalb directed White to do whatever she needed to and to keep him informed. White also approached Kelly Hutchings, the portfolio manager of Cyberco's account, with her concerns. She specifically expressed her confusion over Teleservices, as the company appeared on the payables report, yet frequently transferred large amounts of money to Cyberco.

By the beginning of 2004, Huntington's officers decided to terminate the bank's relationship with Cyberco. Around that time, Kalb explained in an internal memo that although there were no demonstrable financial reasons for terminating the relationship, there had always been "red flags" associated with the account. Kalb informed James Dunlap, Huntington's Regional President, of the decision and then instructed Hutchings to relay the news to Cyberco. Soon thereafter, Hutchings and another Huntington employee met with Krista Watson and Horton and informed them that the parties' banking relationship was not "a good fit." They did not discuss the "red flags" associated with the account.

Cyberco elected to undergo a "gradual migration" from Huntington, and Huntington agreed to allow credit extensions to Cyberco during a transition period. As a prerequisite for this courtesy, however, Huntington required Cyberco to produce overdue audited financial statements for 2002, which Huntington had requested unsuccessfully for months prior thereto. Although the audited financial statements were never produced, Huntington did extend Cyberco's line of credit twice. In connection with the second extension, granted on April 22, 2004, Hutchings posed a list of questions to Cyberco concerning its history of overdrafts, failure to abide by the parties' banking

agreement, and its relationship to Teleservices. Krista Watson and Horton, responding on behalf of Cyberco, expressed a sense of insult and explained away the issues as clerical errors and results of Huntington's incompetence.

Around the time of the second extension, White communicated suspicions of receivables fraud to Kalb and shared her belief that Huntington should begin auditing Cyberco's receivables. White also contacted Larry Rodriguez, Huntington's West Michigan Corporate Security Officer and a 26-year veteran of the Michigan State Police. Rodriguez began investigating White's suspicions. After a few weeks of investigation and an interview with White, Rodriguez suspected possible fraud. He informed Richard Harp, his supervisor, of his suspicion, and Harp then authorized Rodriguez to contact the FBI.

Rodriguez approached Special Agent William Blynn, who informed him that the FBI was already actively investigating Cyberco. He also approached Agent Roberta Gilligan, who led the Cyberco investigation, and relayed his suspicions and concerns to her. He learned, among other things, that Barton Watson had a criminal history and had been sanctioned previously by the Securities Exchange Commission ("SEC").

Rodriguez also arranged a meeting between Gilligan and White in May 2004. At that meeting, White shared her entire Cyberco file with Gilligan. White also provided a detailed account of Huntington's relationship with Cyberco, the "red flags" associated with Cyberco's account, and conclusions she had reached from her own investigation into the company. Gilligan did not provide White with any confirmation of White's suspicions, but the two met twice later. In the last interview, White reported that Huntington had demanded Cyberco pay off its line of credit by August 27, 2004.

Between March and October 2004, El Camino entered into lease schedules with Cyberco. Their transactions took place after Huntington informed Cyberco that it was severing the parties' banking relationship and after Huntington had initially contacted the FBI. Simultaneously, Huntington scrambled to encourage Cyberco to pay down its line of credit and other outstanding loans. Between July and the end of October, Huntington accepted nine large checks directly from Teleservices, totaling nearly

$9 million. Cyberco's web of fraud unraveled shortly thereafter and FBI agents executed search warrants on Cyberco's offices in November 2004.

In the course of El Camino's dealings with Cyberco, it purchased over $25 million in computer equipment. It asserted numerous causes of action against Huntington for its role in the fraudulent transactions. The district court entered summary judgment, concluding that El Camino could not establish the required level of knowledge to pursue its claims for conversion, aiding and abetting conversion, and aiding and abetting fraud.

Approximately one year after the district court's ruling, the bankruptcy court issued an opinion in a proceeding related to this case. In that avoidance proceeding, the bankruptcy trustee of Teleservices brought an adversary proceeding against Huntington to recover fraudulent transfers it received from Teleservices into Cyberco's accounts. *Meoli v. Huntington Nat'l Bank (In re Teleservices)*, 444 B.R. 767 (Bankr. W.D. Mich. 2011). The bankruptcy court, following a 12-day trial to decide on Huntington's asserted "good faith" defense, concluded that Huntington "did not accept in good faith" the checks it received directly from Teleservices. *Id*. at 830. Based upon this finding, El Camino moved the district court to reconsider its summary judgment for Huntington, but the motion was denied.

## II.

We review a grant of summary judgment *de novo*. *Sommer v. Davis*, 317 F.3d 686, 690 (6th Cir. 2003). Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We construe all reasonable factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**A. Aiding and Abetting Liability.**

The Michigan Supreme Court has never expressly recognized a common-law claim for aiding and abetting tortious conduct. However, the Michigan Court of Appeals has done so in several contexts. *See Echelon Homes L.L.C. v. Carter Lumber Co.*, 683 N.W.2d 171, 179 (Mich. Ct. App. 2004), *rev'd in part on other grounds by* 694 N.W.2d 544 (2005) (recognizing both aiding and abetting breach of fiduciary duties and aiding and abetting conversion); *Kratze v. Indep. Order of Oddfellows*, 475 N.W.2d 405, 408 (Mich Ct. App. 1991), *rev'd in part on other grounds by* 500 N.W.2d 115 (1993) (recognizing aiding and abetting trespass); *Trail Clinic, P.C. v. Bloch*, 319 N.W.2d 638, 641 (Mich. Ct. App. 1982) (recognizing aiding and abetting conversion). Accordingly, we have recognized that Michigan law permits a cause of action for aiding and abetting conversion. *See Carbonic Prods. v. Welding & Cutting Supply Co.*, 823 F.2d 553 (6th Cir. 1987) (per curiam) (unpublished table decision). Furthermore, and as the parties and the district court agreed, the Michigan Supreme Court, if faced with the opportunity to do so, would adopt the approach of aiding and abetting as set forth in § 876(b) of the Restatement (Second) of Torts. Section (b) states that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ." (1979). Proof of an aiding and abetting claim therefore requires (1) knowledge of wrongful conduct by the aider/abettor; and (2) substantial assistance of the wrongful conduct by the aider/abettor.

**1. Actual vs. Constructive Knowledge.**

The gravamen of this appeal is the level of knowledge required to prove an aiding and abetting tortious conduct claim under Michigan state law. Because the Michigan Supreme Court has not ruled on this issue, we must ascertain the state law from "all available data," which includes decisions by the Michigan Court of Appeals, dicta from the Michigan Supreme Court, cases from other jurisdictions, and secondary sources. *Angelotta v. Am. Broad. Corp.*, 820 F.2d 806, 807 (6th Cir. 1987).

El Camino argues in its briefs that an aider or abettor's knowledge of wrongful conduct may be proven by circumstantial evidence and that "general awareness" of the wrongful conduct is sufficient. However, counsel for El Camino conceded at oral argument that the correct standard under Michigan law is actual knowledge which may be proven by circumstantial evidence.

We agree that actual knowledge is required to prove a claim for aiding and abetting tortious conduct under Michigan law. When asked previously to interpret "knowledge" in the context of aiding and abetting claims fashioned after § 876(b) of the Restatement (Second) of Torts, we held that actual knowledge was required. *See Aetna Cas. and Sur. Co. v. Leahey Constr. Co., Inc.*, 219 F.3d 519, 533-34 (6th Cir. 2000). In addition, the requirement of actual knowledge has been accepted by the Michigan Supreme Court and Michigan Court of Appeals in the context of statutory aiding and abetting claims. *See Echelon Homes, L.L.C. v. Carter Lumber Co.*, 694 N.W.2d 544, 547 (Mich. 2005).

### 2. Sufficiency of Evidence Presented Regarding Actual Knowledge.

Assuming that the Michigan Supreme Court would adopt the actual knowledge standard, we must determine if, construing all reasonable inferences in favor of El Camino, a genuine issue of material fact exists as to whether Huntington knew about Cyberco's alleged fraud in the inducement and conversion. Because Huntington had, at best, a strong suspicion of wrongdoing, but no actual knowledge of Cyberco's scheme or fraud, El Camino cannot succeed on its claims.

The record is devoid of direct or circumstantial evidence that Huntington had actual knowledge of the specific torts perpetrated by Cyberco against El Camino. No evidence has been presented that Huntington knew the nature of Cyberco's transactions or that it dealt in nonexistent inventory. Similarly, there is no dispute that Huntington did not understand how Cyberco operated and with whom it did business. The district court combed meticulously through the evidence and correctly identified no allegation

that Huntington actually knew that Cyberco was engaged in a scheme to defraud companies, or more particularly, that it defrauded El Camino.

Huntington did, however, know that Cyberco's account exhibited odd and suspicious behavior. Cyberco received large payments from Teleservices, payments Huntington believed were used to pay finance companies. However, Huntington did not understand how Teleservices and Cyberco were related or how Teleservices was funded. Similarly, Huntington, through Rodriguez, knew that Barton Watson had been sanctioned previously by the SEC for a securities violation. However, Huntington was unaware of any specific wrongdoing by Watson in the banking relationship between Cyberco and Huntington.

El Camino also alleges that Huntington's employee, White, knew how Cyberco's fraud operated and shared this with the FBI during her meetings with Agent Gilligan. However, and as the district court correctly concluded, this was not supported by the record. Agent Gilligan testified that the FBI lacked sufficient grounds to believe Teleservices was fraudulent until November 2004, which is when it obtained a search warrant for Cyberco's offices. Had Huntington or its employees shared with the FBI that Cyberco was defrauding customers, the FBI could have acted upon the information sooner. El Camino's allegation that White knew specifics about the scheme therefore contradicts the evidence in the record.

These facts speak volumes to Huntington's suspicion of wrongdoing, but say nothing of its actual knowledge of Cyberco's wrongdoing. Because the record contains no evidence of actual knowledge of fraud or conversion, the district court properly granted summary judgment to Huntington on the aiding and abetting claims.

**B. Conversion.**

The district court also granted summary judgment to Huntington on the statutory claim of conversion. Michigan Compiled Laws § 600.2919a provides recovery for a person "damaged as a result of another's buying, receiving, or aiding in the concealment of any stolen, embezzled or converted property" if the person "buying, receiving or

aiding" in the wrongdoing "knew that the property was stolen, embezzled, or converted."[1] As discussed above, the Michigan Supreme Court has unequivocally held that the statute requires proof of actual knowledge that property was indeed stolen, embezzled, or converted. *Echelon Homes*, 694 N.W.2d at 549.

El Camino challenges the district court's determination that it failed to present a triable fact on the issue of actual knowledge. For the same reasons articulated above, however, the district court properly found that the record presented no evidence of Huntington's actual knowledge that funds in Cyberco's account were stolen, embezzled, or converted. Therefore, the district court properly granted summary judgment to Huntington on the conversion claim.

**C. Related Bankruptcy Proceedings.**

El Camino finally argues that the district court erred in denying its motion for reconsideration based upon the bankruptcy court's preliminary factual findings. In the avoidance proceeding, the bankruptcy court has issued two written opinions. In one of these opinions, it specifically found that Huntington did not act in good faith when it accepted payments from Teleservices.

El Camino argues that the absence of good faith is evidence that Huntington had actual knowledge of Cyberco's fraud and urges this court to find error in the district court's refusal to reconsider its summary judgment ruling. The issue of good faith, however, is distinct from the issue of actual knowledge. Furthermore, El Camino offers no authority in support of its position that the district court was required to consider the bankruptcy court's finding, even if it was related to the issue litigated in this case.

The bankruptcy court's preliminary findings do not speak directly to whether Huntington had actual knowledge of Cyberco's wrongdoings, which is the heart of El Camino's arguments on appeal. The bankruptcy findings speak only to whether Huntington acted in good faith in accepting payments from Teleservices. In fact, the

---

[1] This statute was amended in 2005. This case is governed by its previous version from the year 2000.

district court, in denying El Camino's request to reconsider its summary judgment ruling, specified that the proceedings before it and those before the bankruptcy court "arose in different legal contexts and, contrary to Plaintiffs' contentions," presented "no conflict in the opinions."

In addition, the district court would not be required to reconsider its summary judgment ruling because the bankruptcy court finding is preliminary and non-binding. The findings are subject to review by the district court which may ultimately decide to reopen factual disputes addressed in the avoidance proceeding. *See In re Teleservices Grp., Inc.*, 456 B.R. 318, 340 n.67 (Bankr. W.D. Mich. 2011); 28 U.S.C. § 157(c)(1). Because the proposed finding addressed an issue different from the one disputed in this case, and because it is neither binding nor final, the district court did not err in refusing to reconsider its ruling.

**AFFIRMED.**