FILED

Jul 24 2018, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Hamish S. Cohen
Sean P. Burke
Mattingly Burke Cohen &
Biederman LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Patrick J. Ruberry
Litchfield Cavo, LLP
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| EngineAir, Inc. and JMA Rail Products, Inc., <br><br> *Appellants-Plaintiffs,* <br><br> v. <br><br> Centra Credit Union, <br><br> *Appellee-Defendant.* | July 24, 2018 <br><br> Court of Appeals Case No. 36A01-1709-CT-2177 <br><br> Appeal from the Jackson Superior Court <br><br> The Honorable Bruce Markel III, Judge <br><br> Trial Court Cause No. 36D01-1704-CT-13 |

**Kirsch, Judge.**

[1] After Angela Kincaid ("Kincaid"), an employee working for both EngineAir, Inc. ("EngineAir") and JMA Rail Products, Inc. ("JMA"), was convicted of having embezzled more than $500,000 from the companies' bank accounts, the

companies sued Kincaid's depositary bank,[1] Centra Credit Union ("Centra Credit"). Citing to Indiana's version of the Uniform Commercial Code ("UCC" or "the Act") and common law negligence, the companies argued that Centra Credit "failed to act with ordinary care when it cashed over 105 fraudulent checks written by Kincaid on EngineAir's, JMA's, and other related entities' accounts." *Appellants' App. Vol. 2* at 10. On Centra Credit's motion, the trial court dismissed the companies' complaint for failure to state a claim pursuant to Indiana Trial Rule 12(B)(6).

[2] The companies raise one issue on appeal, which we restate as: Whether the trial court erred when it dismissed the companies' complaint for failure to state a claim under Indiana Trial Rule 12(B)(6) after concluding that (1) Centra Credit, as the depositary bank, owed the companies, as drawers, no duty of care as a matter of law for the loss the companies sustained when Kincaid deposited checks that she had stolen from the companies, made out to herself as payee, and, on which she had forged the signature of the companies' president;[2] (2) the UCC warranties created no warranty or statutory obligation from Centra Credit to the companies; and (3) Centra Credit's failure to report Kincaid's extreme banking activity as suspicious did not constitute a breach of duty.

---

[1] "Depositary bank" means "the first bank to take an item even though it is also the payor bank, unless the item is presented for immediate payment over the counter." Ind. Code § 26-1-4-105.

[2] It is not clear whether the Companies had the same president; however, in their complaint, the Companies refer to the "Plaintiffs' president's signature." *Appellants' App.* at 12.

We affirm.

## Facts and Procedural History

EngineAir and JMA (together, "the Companies"), acting as "sister" corporations and located in Jackson County, Indiana, are small, family-owned and-operated manufacturing and supply businesses, with similar ownership and management structures. *Appellants' Br*. at 6. In their complaint, the Companies pleaded the following facts. In the first quarter of 2013, the Companies and JMA Railroad Supply Company ("JMA Supply"), a related corporation, collectively hired Kincaid as their bookkeeper and internal accountant. In that position, Kincaid was responsible for billing, accounts payable, accounts receivable, handling bank deposits, as well as other "related financial matters." *Appellants' App*. *Vol. 2* at 12.

Within one month of being hired, Kincaid began embezzling money from the Companies and from JMA Supply by "cut[ting] checks to herself while fraudulently forging the [Companies'] president's signature." *Id*. Kincaid would then deposit those checks into her personal bank account with Centra Credit. "Kincaid started her fraudulent scheme slowly to evade detection." *Appellants' Br*. at 7. For example, in September, October, and December 2013, she fraudulently deposited a total of four checks drawn on JMA Supply's account, totaling $16,712. We note that any claims relating to these checks are time barred, and therefore, JMA Supply is not a party to this action. *Id*.

[6] Kincaid's fraudulent activity increased rapidly, and in May 2014, she deposited into her Centra Credit account seven checks totaling $13,950, all of which were written against JMA's account. *Appellants' App. Vol 2* at 12. Beginning in August 2014, Kincaid began depositing numerous forged checks into her Centra Credit account on an increasingly frequent basis. For instance, in August 2014, Kincaid deposited seven checks, dated August 7, 8, 13, 20, 22, 26[,] and 26, totaling $25,300. *Id.* Thereafter, the rate and amount of fraudulent checks continued to increase. *Id.*

[7] By April 2015, the last full month before Kincaid's illegal activity was discovered, she deposited one or more checks on April 1, 2, 7, 8, 13, 15, 16, 17, 21, 24, 27, 28, and 30. Together, these checks totaled $116,300. *Id.* at 12-13. All of those checks were drawn on EngineAir's account and deposited into Kincaid's personal account at Centra Credit. In the ten months leading up to May 2015, Kincaid deposited more than 100 fraudulent EngineAir checks. *Id.* at 13. In total, Kincaid stole more than $540,450 from the Companies, all of which was in the form of checks that Kincaid deposited into her personal account with Centra Credit and then withdrew as cash immediately after each check had cleared. *Id.* at 10, 13.

[8] On May 18, 2015, in the routine course of transferring funds to pay a vendor, EngineAir's president learned that EngineAir's checking account had a balance of only $2,000; the financial records prepared by Kincaid reflected a balance of $178,000. *Id.* at 14. EngineAir evaluated the account and discovered that Kincaid had been embezzling money from the Companies' accounts. Kincaid

was charged, pleaded guilty, and was sentenced to forty-one months in federal prison.

[9] On April 11, 2017, the Companies filed their complaint seeking damages from Centra Credit for the bank's negligence in having accepted and deposited dozens of fraudulent checks and allowing Kincaid to withdraw those funds from her Centra Credit account.[3] *Appellants' App. Vol. 2* at 11. The Companies sought damages under the UCC and common law negligence. *Id*. at 10-17.

[10] On June 2, 2017, Centra Credit filed a Trial Rule 12(B)(6) motion to dismiss for failure to state a claim. Centra Credit argued that: (1) the Companies could not proceed, since under the general rule, a bank does not owe a non-customer a duty of care; (2) negligence cases, generally, are preempted by the UCC; (3) under the UCC, Centra Credit owes no duty to the Companies, and (4) recovery of monetary damages by the Companies was precluded by the economic loss doctrine.[4] *Id*. at 23-32.

[11] The Companies responded, arguing that Centra Credit owed the Companies a duty of care pursuant to the UCC, particularly, Indiana Code section 26-1-3.1-

---

[3] The Companies seek to recover damages arising from a multitude of fraudulent checks, some of which may be barred by the statute of limitations. Because this is a review of the grant of a motion to dismiss, we need only determine whether the Companies' complaint states a claim with respect to one of the checks.

[4] During the August 2017 hearing on Centra Credit's motion to dismiss, both parties addressed the question of whether the economic loss doctrine prevented the Companies from bringing this suit. The trial court's Order, however, made no reference to the economic loss doctrine, and the parties have not raised that issue on appeal. Furthermore, finding, as we do, that the Companies' complaint was properly dismissed for failure to state a claim, we need not address this issue.

405, the UCC's warranty provisions, and Indiana negligence law generally. *Id.* at 63-77. The Companies argued that, even if Indiana were to adopt the general rule that banks do not owe a non-customer a duty of care, "an award of damages, is appropriate under the 'exceptional circumstances' of this case as pled in the complaint because [Centra Credit] accepted numerous checks totaling a large amount while not following its own internal policies or federal regulations." *Id.* at 64. The trial court heard argument on August 7, 2017, and on August 23, 2017, it entered an Order (the "Order") granting Centra Credit's motion to dismiss. The Companies now appeal.

## Discussion and Decision

[12] We review de novo a trial court's grant or denial of a motion to dismiss for failure to state a claim, pursuant to Trial Rule 12(B)(6), giving no deference to the trial court's decision. *Babes Showclub v. Lair*, 918 N.E.2d 308, 310 (Ind. 2009). Such a motion tests the legal sufficiency of the plaintiff's claim, not the facts supporting it. *Thornton v. State*, 43 N.E.3d 585, 587 (Ind. 2015); *Alford v. Johnson Cnty. Comm'rs*, 92 N.E.3d 653, 659 (Ind. Ct. App. 2017).

> Inasmuch as motions to dismiss are not favored by the law, they are properly granted only "when the allegations present no possible set of facts upon which the complainant can recover." *Mart v. Hess*, 703 N.E.2d 190, 193 (Ind. Ct. App. 1998). Put another way, a dismissal under Rule 12(B)(6) will not be affirmed "unless it is apparent that the facts alleged in the challenged pleading are incapable of supporting relief under any set of circumstances." *Couch v. Hamilton Cnty.*, 609 N.E.2d 39, 41 (Ind. Ct. App. 1993).

*Magic Circle Corp. v. Crowe Horwath, LLP*, 72 N.E.3d 919, 922-23 (Ind. Ct. App. 2017) (quoting *City of E. Chicago, Ind. v. E. Chicago Second Century, Inc.*, 908 N.E.2d 611, 617 (Ind. 2009)). "In reviewing the complaint, we take the alleged facts to be true and consider the allegations in the light most favorable to the nonmoving party, drawing every reasonable inference in that party's favor." *Hoosier Ins. Co. v. Riggs*, 92 N.E.3d 685, 687 (Ind. Ct. App. 2018).

[13]     The Companies filed their complaint seeking damages from Centra Credit "for Centra's negligence in accepting, cashing[,] and providing funds to [the Companies'] employee and Centra's customer[,] Angela Kincaid. [The Companies] sought damages pursuant to common law negligence and [UCC] provisions." *Appellants' Br*. at 5. The trial court, having heard the arguments of counsel and having reviewed the law, dismissed the Companies' complaint pursuant to Trial Rule 12(B)(6) concluding:

> 1. Indiana has not established a duty of care between a mere collecting bank and the customer of a payor bank;
>
> 2. There is no statutory law in Indiana that creates a warranty or other statutory obligation from the Defendant collecting bank to the Plaintiffs, individually or as customers of their bank, the payor bank; and
>
> 3. Any failure of the Defendant bank to act in a commercially reasonable manner or to report "Suspicious Activity" to federal authorities is not a breach of any established duty to the Plaintiffs.

*Appellants' App*. *Vol. 2* at 8.

# Duty of Care

[14] The Companies first contend that the trial court erred in dismissing their complaint because, contrary to the trial court's conclusion, a duty of care can exist between a depositary bank and a non-customer drawer. The Companies argue that "the question of whether a bank may owe a non-customer a duty has been established," and each court having addressed that issue "has found or presumed that such a duty may exist." *Appellants' Br.* at 13 (citing *Auto-Owners Ins. Co. v. Bank One*, 879 N.E.2d 1086 (Ind. 2008)).[5] While a depositary bank may, under certain circumstances, owe a duty of care to a non-customer, because our review is de novo, the question before this court is whether Centra Credit owed a duty of care to the Companies.

[15] In their complaint, the Companies asserted that pursuant to established Indiana law and the UCC, Centra Credit owed the Companies "a duty to exercise ordinary care in inspecting, negotiating and making a reasonable inquiry with respect to the checks submitted by Kincaid." *Appellants' App.* at 14. Specifically, the Companies claimed that: (1) Centra Credit failed to exercise reasonable care in paying or taking the instruments at issue; (2) it was not commercially reasonable for Centra Credit to take the checks at issue; (3) Kincaid's conduct should have raised red flags; (4) Kincaid's activity was so extreme, it should have triggered Centra Credit's Suspicious Activity Reporting

---

[5] We discuss *Auto-Owners Ins. Co. v. Bank One*, 879 N.E.2d 1086 (Ind. 2008) later in our decision.

requirements under applicable federal law; (5) Centra Credit knew, suspected, or should have known that the deposits and withdrawals were designed to conceal unlawful activity; (6) Centra Credit violated its duty by failing to exercise ordinary care when taking or paying the checks; and (7) the Companies were injured by that breach of duty. *Appellants' App.* at 14-16. The Companies cited to no specific UCC sections in their complaint; however, in their response to Centra Credit's motion to dismiss, the Companies argued that Centra Credit owed them a duty of care through Indiana Code section 26-1-3.1-405 and the UCC's warranty provisions. *Appellants' Br.* at 5.

[16]   The Companies suggest that common law negligence and the UCC operate jointly and, therefore, the Companies can bring a common law negligence action in addition to any UCC claim. Centra Credit counters that the UCC "preempted negligence claims generally," and, since the Companies' claims fall within the provisions of the UCC, any common law claim arising from Centra Credit's conduct is "displaced." *Appellee's Br.* at 8. Accordingly, we begin by discussing the general applicability of the UCC and its interplay with common law negligence.

[17]   The Indiana General Assembly adopted the UCC with the intent that the Act be "liberally construed and applied to promote its underlying purposes and policies," which include: (1) to simplify, clarify, and modernize the laws governing commercial transactions; (2) to permit continued expansion of commercial practices through custom, usage, and party agreements; and (3) to make uniform the law among the various jurisdictions. Ind. Code § 26-1-1-

102(1), (2).[6]  Comment 1 to UCC Section 1-102 explains that the Act "is drawn to provide flexibility" so that it "will provide its own machinery for expansion of commercial practices."[7]  In other words, the UCC "is intended to make it possible for the law embodied in [that] Act to be developed by the courts in the light of unforeseen and new circumstances and practices."  Ind. Code § 26-1-1-102, cmt. 1.

[18]  The drafters of the UCC determined that "Negotiable Instruments" and "Bank Deposits and Collections" were proper subjects for commercial uniformity, and the Indiana General Assembly adopted those laws into what are now Indiana Code chapter 26-1-3.1 ("UCC Article 3.1") and Indiana Code chapter 26-1-4 ("UCC Article 4"), respectively.  A check is subject to provisions contained in UCC Article 3.1.  Ind. Code § 26-1-3.1-102(a), -104.  Once deposited and transferred through the banking system for payment, a check is also subject to

---

[6] In this decision, all citations to the Indiana Code are found in Title 26 and Article 1.  For ease of reference, we will shorten any citation that appears in a sentence from Indiana Code section 26-1-1-102 to UCC Section 1-102.

[7] In the Indiana Practice Series, the Author's Comments to UCC Section 1-101 provide,

> Indiana did not adopt the Official Comments to the UCC as part of the 2007 revisions to its version of the UCC.  Nevertheless, some courts look to the Official Comments to the UCC for guidance in applying and interpreting Indiana's version of the UCC.  *See Collins v. Pfizer*, 2009 WL 126913, *2 (S.D. Ind. Jan. 20, 2009).  "In general, Indiana courts treat the official comments as an authoritative guide to the UCC."  *See also In re Scott*, 427 B.R. 123, 71 U.C.C. Rep. Serv. 2d 314 (Bankr. S.D. Ind. 2010) (discussing persuasive authority of Official Comments to UCC notwithstanding that Indiana did not adopt them as part of its version of the UCC).

7 Ind. Prac., *UCC Forms Annotated* § 26-1-1-101 (3d ed.))

UCC Article 4. The legislature has determined that when the two chapters conflict, Article 4 governs. Ind. Code § 26-1-3.1-102(b).

[19] Since UCC Article 3.1 and Article 4 address complicated relationships and include specific terms of art, an introduction to the specific nomenclature is helpful. A "negotiable instrument" is an unconditional promise to pay a fixed amount of money, payable to bearer, on demand, and with no other promises from the drawer. Ind. Code § 26-1-3.1-104(a). The definition of "check" includes "a draft, other than a documentary draft, payable on demand and drawn on a bank." Ind. Code § 26-1-3.1-104(f). The checks at issue were negotiable instruments. The "drawer" is a person identified in a check as the one ordering the payment; Kincaid's use of the Companies' checks made the Companies the drawers. Ind. Code § 26-1-3.1-103(a)(5). "Drawee" means a person ordered in a draft to make a payment; here, the Companies' bank was the drawee or payor bank.[8] Ind. Code § 26-1-3.1-103(a)(4). An "endorsement is the signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of negotiating the instrument." Ind. Code § 26-1-3.1-204. "Endorser" means the person who makes the endorsement. Ind. Code § 26-1-3.1-204(b). Kincaid became the endorser when she endorsed the back of each fraudulent check to

---

[8] "Payor bank" means "a bank that is the drawee of the draft." Ind. Code § 26-1-4-105(3).

deposit it into her Centra Credit account; and, once Kincaid deposited the forged checks, Centra Credit became the depositary bank.

[20] A check typically involves three parties: the drawer, on whose account the check is drawn; the payee, to whose order the check is made out; and the drawee or payor bank, from which the drawer's check is to be paid. In form, a check is an order to the drawee bank to pay the face amount of the check to the payee. After receiving the check, the payee typically endorses it on the back in the payee's own name and then deposits it into the payee's account at the depositary bank. The depositary bank credits the check to the payee's account and sends the check through the check clearing system to the drawee bank for payment, and if it is properly paid, the drawee then deducts the payment from the drawer's account. Any bank through which the check passes in the clearing process is an "intermediary bank." Ind. Code § 26-1-4-105(4). Any bank handling the check for collection, including the depositary bank, but excluding the payor bank, is referred to as a "collecting bank." Ind. Code § 26-1-4-105(5).

[21] Because (1) not every check or collection scenario falls within the coverage of the UCC and (2) "the proper construction of the [UCC] requires that its interpretation and application be limited to its reason," UCC Section 1-102, comment 1, the drafters included Section 1-103, which provides,

> Unless displaced by the particular provisions of [the UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy,

or other validating or invalidating cause, shall supplement the provisions of IC 26-1.

Ind. Code § 26-1-1-103. That being said, where the UCC addresses a specific commercial practice, the UCC displaces the common law. *Cf. Farmers Loan & Tr. Co. v. Letsinger*, 652 N.E.2d 63, 65 (Ind. 1995) ("Because no particular provision of the UCC governs the bank's claim on the guaranty, Indiana common law and the Indiana law of equity control."). To determine whether the common law has been displaced in the instant case, we consider the UCC scheme and common law duty as applied to the parties before us.

[22] The Companies' complaint is premised primarily on a theory that Centra Credit owed the Companies a duty of care and breached that duty when it did not alert the Companies about Kincaid's unusual deposits and withdrawals. To recover under a theory of negligence, a plaintiff must prove three elements:

> (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach.

*Harper v. Hippensteel*, 994 N.E.2d 1233, 1237 (Ind. Ct. App. 2013) (quoting *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991)). Before reaching the questions of breach and injury, we must consider the threshold matter of whether Centra Credit owed a duty to the Companies. Absent a duty, there can be no breach

and, therefore, no recovery in negligence. *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476 (Ind. Ct. App. 2004), *trans. denied*.

[23] Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide. *N. Ind. Pub. Serv. Co. v. Sharp,* 790 N.E.2d 462, 466 (Ind. 2003); *Williams*, 809 N.E.2d at 476. In their brief, the Companies, claiming that Centra Credit owes them a common law duty, focus on the "three-part balancing test developed by [our Supreme Court]." *Yost v. Wabash Coll.*, 3 N.E.3d 509, 515 (Ind. 2014). Those factors are: (1) the relationship between the parties; (2) the reasonable foreseeability of the harm to the person injured; and (3) public policy concerns. *Id.*; *Williams*, 809 N.E.2d at 476.

### *Relationship between the Centra Credit and the Companies*

[24] The Companies' entire argument regarding the relationship between the parties is as follows: "[T]he parties relationship[,] that of the drawer of a check and the depository bank, justifies a finding of duty, especially where, as here, the dismissed complaint alleges Centra Credit knew or should have known of the misconduct at issue and where special circumstances existed." *Appellants' Br.* at 23. Our court has said, "A duty of reasonable care is 'not, of course, owed to the world at large,' but arises out of a relationship between the parties."[9] *Id.*

---

[9] We note that a duty can arise from a contractual relationship; however, here, the parties make no claim that a contractual relationship exists. *See Harper v. Hippensteel*, 994 N.E.2d 1233, 1237 (Ind. Ct. App. 2013) ("duty arises from the contractual relationship entered into between the doctor and patient").

Indiana courts "have a long and continuous history of recognizing negligence actions for statutory violations." *Kho v. Pennington*, 875 N.E.2d 208, 212 (Ind. 2007). Citing to Section 3.1-405, the Companies claim that this section creates a duty, which allows them to sue Centra Credit. In support of that claim, the Companies cite to *Auto-Owners Insurance Co. v. Bank One*, 879 N.E.2d 1086, 1089-90 (Ind. 2008), in which our Supreme Court, analyzing UCC Section 3.1-405, accepted that an employer could bring a cause of action, but found negligence in account opening was insufficient, by itself, to state a claim pursuant to UCC Section 3.1-405. *Appellants' App*. at 5.

Section 3.1-405(b) provides:

> For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the *employee or a person acting in concert with the employee makes a fraudulent endorsement of the instrument*, the endorsement is effective as the endorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the person bearing the loss proves that the failure to exercise ordinary care substantially contributed to the loss.

Ind. Code § 26-1-3.1-405 (emphasis added). The plain meaning of Section 3.1-405 is that it applies only to *forged endorsements* and not, like here, to *forged*

*signatures.* This interpretation is supported by Comment 1 UCC Section 3.1-405, which states:

> Section 3-405 is addressed to *fraudulent indorsements*[10] made by an employee with respect to instruments with respect to which the employer has given responsibility to the employee. . . . This section applies to instruments generally but normally the instrument will be a check. Section 3-405 adopts the principle that the risk of loss for *fraudulent indorsements* by employees who are entrusted with responsibility with respect to checks should fall on the employer rather than the bank that takes the check or pays it, if the bank was not negligent in the transaction. Section 3-405 is based on the belief that the employer is in a far better position to avoid the loss by care in choosing employees, in supervising them, and in adopting other measures . . . .

We find that Centra Credit owes no duty to the Companies arising under Section 3.1-405, and therefore no cause of action against Centra Credit arises under that section.

### Foreseeability and Public Policy

[27] The Companies also contend that Centra Credit owed them a common law duty of care because it was foreseeable that a fraudulent transaction could result in loss for the Companies and because public policy demands it. *Appellants' Br.* at 15-23. "The general stance of Articles 3 and 4 is to place losses for forged drawer's signatures initially on the payor bank and for forged indorsements or

---

[10] We note that the Indiana Code uses "endorsement," and the comments use "indorsement." We use these spellings interchangeably.

alterations on the first party to take the instrument after the theft." A. Brooke Overby, *Check Fraud in the Courts after the Revisions to U.C.C. Articles 3 and 4*, 57 Ala. L. Rev. 351, 361 (2005). Naturally, a person who commits forgery by means of a negotiable instrument should be responsible for any loss; however, "when the curtain rises on the last act, the wrongdoer will either be off the scene or insolvent." 2 James J. White, Robert S. Summers, & Robert A. Hillman, *Uniform Commercial Code* § 19:10 (6th ed. 2013). Recognizing this principle, the drafters of the UCC contemplated the allocation of this loss. "The U.C.C. accomplishes this allocation through a rather complicated series of causes of action." Overby*, supra,* at 361-62. "These actions are founded upon contract-based, warranty-based, and property-based provisions scattered throughout the Code." *Id*. at 362.

[28] As pertinent to this appeal, that allocation takes into consideration: (1) whether the fraudulent transaction involved an unauthorized signature, Ind. Code §§ 26-1-3.1-401, 3.1-402, Ind. Code § 26-1-3.1-403, or a fraudulent endorsement, Ind. Code § 26-1-3.1-405; (2) whether the loss occurred as the result of a transfer to a collecting bank, Ind. Code §§ 26-1-3.1-416, 4-207, or a presentment to a payor bank, Ind. Code §§ 26-1-3.1-417, 4-208; (3) whether a fraudulent endorsement was committed at the hand of the drawer's employee who had access to the drawer's checks, Ind. Code § 26-1-3.1-405, and (4) whether the drawer was negligent in duties owed, Ind. Code § 26-1-4-406. This complex scheme reveals that the drafters of the UCC considered both foreseeability and public policy when they drafted the Act.

As a general rule, under the UCC a drawer is not liable on a negotiable instrument unless the person or his agent signed the instrument. Ind. Code § 26-1-3.1-401, -402. The corollary to that rule is that a bank has the authority to "charge against the account of a customer an item that is properly payable from that account . . . ." Ind. Code § 26-1-4-401(a). "By implication, the section also tells when a bank 'may not' charge the account." White & Summers, *supra*, § 19.3. "An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank." *Id.* A bank does not "properly pay" over a forgery. *Id.* If, like here, a drawee bank does not discover the forged signature, but makes a final payment on the check, the drawee, in the absence of a drawer's negligence, may not charge the drawer's account and, therefore, will bear the loss. Kincaid forged the signature of the Companies' president, and the Companies did not authorize the payment of the forged checks, so without more, the Companies would not have been liable for their losses.

Under circumstances, like here, where the drawee pays over a forged signature and withdraws the money from the drawer's account, the UCC contemplates that the drawer will have an action against the drawee bank for breach of the customer's contract with the bank or a statutory claim under UCC Section 4-401.[11] *Id.* Even so, the UCC "hold[s] each negligent party liable for its

---

[11] Prior to the UCC's 1990 amendments, "some courts found drawers of stolen checks to be proper plaintiffs in conversion actions"; however, "[w]ith the 1990 addition of section 3-420, the conversion action is no longer available to drawers of stolen checks or to payees who never had actual or constructive possession of

substantial contribution to the loss." White & Summers, *supra*, §19.14. "This allocation of liability based on comparative negligence was incorporated into the [Act] as part of the 1990 amendments to Articles 3[.1] and 4." *Id.*

That allocation occurs, in part, through UCC Section 4-406, which requires a bank to make "available to a customer a statement of account showing payment of items for the account available to a customer" sufficient for the customer to identify the items paid. Ind. Code § 26-1-4-406(a). Under UCC Section 4-406(c), the customer must then

> exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

Ind. Code § 26-1-4-406(c). If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c), "the customer is precluded from asserting against the bank: . . . the customer's unauthorized signature . . . by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature . . . and after

---

stolen instruments bearing their names." UCC Section 3.1-420(a), in pertinent part provides, "An action for conversion of an instrument may not be brought by: (1) the issuer or acceptor of the instrument; or (2) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee." Ind. Code § 26-1-3.1-420.

the customer had been afforded a reasonable period of time, not exceeding thirty (30) days, in which to examine the item or statement of account and notify the bank." Ind. Code § 26-1-4-406(d)(2).

[32] As Centra Credit correctly notes, imposing a duty of reasonable care on Centra Credit, as a depository bank, to monitor checks with forged signatures, would place Centra Credit in the position of being an insurer for non-customers unfortunate enough to hire thieves and embezzlers. *Appellee's Br.* at 13. Furthermore, to recognize this putative duty between Centra Credit and the Companies "would ultimately undermine UCC Section 4-406, which places a duty on the account holder to "promptly report any unauthorized signature on a check or other financial instrument." *Appellee's Br*. at 13-14. The drafters of the UCC determined that the loss should be placed on the party best able to avoid it. The UCC's provisions reflect that Centra Credit, as the depositary bank, was not in the best position to avoid this loss when the loss arose from the forged signature of the Companies' president, a signature with which Centra Credit had no familiarity.

[33] With the goal to simplify, clarify, and modernize the laws governing commercial transactions and allow continued expansion of commercial practices through custom and usage, the drafters of the UCC intended to bring this foreseeable fraudulent commercial transaction under the UCC. Accordingly, we conclude that the Companies have no claim of negligence at common law. Instead, as non-customers, their remedy, if any, must arise from the UCC.

## Transfer and Presentment Warranties

[34]     Without citation to a specific UCC section, the Companies also argue that they can pursue a claim against Centra Credit for breach of "the UCC's warranty provisions." *Appellants' Br*. at 5. Chapter 3.1 and Chapter 4 include two types of warranties: "transfer" warranties and "presentment" warranties. The UCC addresses "transfer warranties" in Indiana Code sections 3.1-416 and 4-207 and "presentment warranties" in Indiana Code sections 3.1-417 and 4-208.[12] These warranties "allow banks to shift all or part of the losses from forgery . . . to each other or to customers." Melissa Waite, *Check Fraud and the Common Law: At the Intersection of Negligence and the Uniform Commercial Code*, 54 B.C. L. Rev. 2205, 2214 (2013).

[35]     The Companies claim that *Insurance Company of North America Insurance v. Purdue National Bank of Lafayette*, 401 N.E.2d 708 (Ind. Ct. App. 1980) (hereafter, "*N.A. Insurance*") is the "leading case on point" to support their claim that a depositary bank may owe a non-customer a duty of care. *Appellants' Br*. at 13. Of importance to the Companies is the *N.A. Insurance* court's reliance on the reasoning and holding set forth by the California Supreme Court in *Sun 'n Sand, Inc. v. United California Bank*, 582 P.2d 920

---

[12] Prior to the UCC's 1990 amendments, the transfer warranties and presentment warranties were contained in one section, Section 3-417 for negotiable instruments and Section 4-207 for bank deposits and collection. 2 James J. White, Robert S. Summers, & Robert A. Hillman, *Uniform Commercial Code* § 19:10 (6th ed. 2013). As part of the amendment, and to help clarify what warranties were granted, the UCC drafters "divided 'transfer' warranties from 'presentment' warranties and [gave] each of them its own section in Article 3 and Article 4." *Id*.

(1978). *Appellants' Br.* at 14. *Sun 'n Sand* held that a drawer whose account was debited by his bank is a "payor" entitled to claim the benefits under the warranties of Sections 3-417 and 4-207, which at that time extended to "the payor bank or other payor who in good faith pays or accepts the item." *Ins. Co. of N. Am.,* 401 N.E.2d at 712 (citing *Sun 'n Sand*, 582 P.2d at 928). Under the holdings in *N.A. Insurance* and *Sun 'n Sand*, a drawer could maintain an action, under Sections 3-417 and 4-207, for breach of warranty against a collecting bank. *Sun 'n Sand*, 582 P.2d at 928-29.

[36] In 1990, however, the drafters of the UCC amended Sections 3-417 and 4-207, removing the "payor" language upon which the California Supreme Court relied and, in so doing, expressly rejected the reasoning and holding of *Sun 'n Sand*.[13] Comment 2 to Section 3.1-417 clearly states,

> There is no warranty made to the drawer under subsection (a) when presentment is made to the drawee. Warranty to the drawer is governed by subsection (d) and that applies only when presentment for payment is made to the drawer with respect to a dishonored draft. In *Sun 'n Sand . . . ,* the court held that under former Section 3-417(1) a warranty was made to the drawer of a check when the check was presented to the drawee for payment. The result in that case is rejected.

---

[13] *N.A. Insurance* was superseded by statute as stated in *Conder v. Union Planters Bank, N.A.*, 384 F.3d 397, 399 (7th Cir. 2004). Likewise, *Sun 'n Sand* was superseded by statute as stated in *Bhaskar v. Farmers & Merchants Bank*, 2017 WL 3381390, at *1 (Cal. Ct. App. Aug. 7, 2017).

[37] Because the *Sun 'n Sand* holding was rejected by the 1990 amendment, so too was the result in *N.A. Insurance*. The Companies have no causes of action against Centra Credit for breach of warranty under the now superseded reasoning in *N.A. Insurance*.

## Bank Secrecy Act and Suspicious Activity Report

[38] The Companies contend that Centra Credit's failure to comply with the reporting requirements of the Bank Secrecy Act ("the BSA"), 31 U.S.C. §§ 5311-5330 and 31 C.F.R. Chapter X, and Suspicious Activity Reports ("SARs)[14] resulted in loss to the Companies because, had those reports been filed, the Companies could have stopped Kincaid's embezzlement sooner. *Appellants' Br*. at 10-11, 22. Underlying this argument is the Companies' assumption that the Companies are parties who should benefit from those federally mandated requirements of the BSA and, therefore, had a claim against Centra Credit for breaching its duty to the Companies when Centra Credit did not file the SARs to report Kincaid's "extreme" banking activity. *Appellants' Br*. at 10.

[39] While we find no discussion of this issue in Indiana law, courts that have considered the question have found that the BSA does not create or authorize a private right of action. *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 476 (7th Cir. 2005) (regulation requiring banks to notify Treasury Department of known or suspected criminal violation does not create private action for damages);

---

[14] The Companies did not provide a specific citation for the SARs.

*AmSouth. Bank v. Dale*, 386 F.3d 763, 777 (6th Cir. 2004) (the BSA does not create a private right of action); *Ventura v. Cent. Bank*, 515 S.W.3d 680, 682-83 (Ky. Ct. App. 2017) ("[T]he BSA provides financial institutions . . . immunity under its safe harbor provision from lawsuits based on the financial institutions' report or disclosure of suspicious activity. 31 U.S.C. § 5318(g)(3)(A)."); *Marchak v. JPMorgan Chase & Co.*, 2016 WL 3911926, at *3 (E.D.N.Y. July 15, 2016)[15] ("The BSA does not authorize a private right of action."); *Grad v. Associated Bank N.A.*, 801 N.W.2d 349, 2011 WL 2184335 (Wis. Ct. App. 2011) (no private right of action created by BSA); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 923 (W.D. Mich. 2010) (BSA does not create private cause of action)*, aff'd by, El Camino Res. Ltd. v. Huntington Nat. Bank*, 712 F.3d 917, 919 (6th Cir. 2013) (BSA does not create private cause of action); *Hannien v. Fedoravitch*, 583 F.Supp.2d 322, 326 (D. Conn. 2008) (holding that neither the Patriot Act nor the BSA authorizes a private right of action). Because there can be no private right of action for a violation of the BSA and its SARs reporting requirements, Centra Credit's failure, if any, to file such reports would not support the Companies' cause of action.

[40] We find that under the facts of this case, the UCC has displaced any cause of action that the Companies may have against Centra Credit. Because the Companies have alleged no theory under which Centra Credit could be liable

---

[15] "While not binding on Indiana courts, we observe that the Federal Rules of Appellate Procedure permit citation to unpublished opinions issued after January 1, 2007. FRAP 32.1(a)." *Triplett v. USX Corp.*, 893 N.E.2d 1107, 1121 n.8 (Ind. Ct. App. 2008), *trans. denied*.

for the loss the Companies sustained from Kincaid's forged checks, we affirm the trial court's grant of Centra Credit's motion to dismiss for failure to state a claim.[16]

[41] Affirmed.

Baker, J., and Bradford, J., concur.

---

[16] In their Reply Brief, the Companies raise for the first time the argument that the "UCC does not bar Plaintiffs' right to seek relief for Centra [Credit]'s aiding and abetting of intentional torts, fraudulent conduct[,] and breaches of fiduciary duty." *Appellants' Reply Br.* at 4. "No new issues shall be raised in the reply brief." Ind. Appellate Rule 46(C). "The law is well settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief, they are waived." *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005); *see Crossmann Cmty., Inc. v. Dean,* 767 N.E.2d 1035, 1044 (Ind. Ct. App. 2002) (issues raised for the first time in a reply brief are deemed waived)). Accordingly, this issue is waived.