*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GENESEE INTERMEDIATE SCHOOL DISTRICT
and GENESEE INTERMEDIATE SCHOOL
DISTRICT BOARD OF EDUCATION,

UNPUBLISHED
August 20, 2020

        Plaintiffs-Appellants,

v

No. 345395
Genesee Circuit Court
LC No. 14-103091-CH

CITY OF FLINT SCHOOL DISTRICT and CITY
OF FLINT SCHOOL DISTRICT BOARD OF
EDUCATION,

        Defendants,

and

YEO & YEO, PC,

        Defendant-Appellee.

Before: REDFORD, P.J., and METER and O'BRIEN, JJ.

PER CURIAM.

Plaintiffs, Genesee Intermediate School District and Genesee Intermediate School District Board of Education (collectively Genesee), appeal as of right the trial court's order granting summary disposition to defendant Yeo & Yeo, PC (Yeo). We affirm.

## I. BACKGROUND FACTS

In 1967, Genesee and the Flint School District and Flint School District Board of Education (collectively Flint unless individually referenced) contracted regarding the construction, operation, and funding of the Genesee Area Skill Center (Skill Center) to provide area students vocational and technical education. Genesee agreed to provide Flint 90% of the funds that Genesee collected through a millage it specially levied for the Skill Center. Flint agreed to deposit those funds into a separate account and use the funds solely for the benefit of the Skill Center. Despite this

-1-

contractual requirement, Flint historically used a pooled-cash accounting method and held the Skill Center funds in its general fund account. Although Flint tracked the Skill Center fund separately, the Flint School District commingled the funds and later used them for other purposes when faced with financial difficulties. Yeo, a public accounting firm, provided auditing services for the Flint School District from approximately 1986 until late 2012.

The central claim by Genesee in this case concerns Flint's combining the Skill Center funds with its general fund and Flint's misuse of Skill Center millage money for purposes unrelated to the Skill Center. Following an audit performed by Plante Moran in 2013 that revealed Flint's use of the funds, on July 8, 2014, Genesee commenced this action against Flint and Yeo. Genesee alleged that Flint misappropriated to its general fund approximately $8.6 million of millage money earmarked for the Skill Center. Genesee alleged breach of contract, fraud, and silent fraud claims against Flint. Genesee ultimately settled and dismissed its claims against Flint.

Genesee initially asserted a claim of aiding and abetting against Yeo. The trial court granted Yeo summary disposition on that claim under MCR 2.116(C)(8) for failure to state a claim. The trial court, however, allowed Genesee to amend its complaint to allege a claim against Yeo for professional malpractice by a certified public accountant under a fraud theory as permitted by MCL 600.2962(1)(b). The trial court denied repeated requests by Genesee to further amend its complaint to add claims of common-law fraud as well as aiding in the concealment of converted or embezzled property under MCL 600.2919a(1)(b). The trial court ultimately granted summary disposition to Yeo on Genesee's claim. The trial court dismissed the portions of Genesee's claim relating to Yeo's actions or statements before July 8, 2012, as untimely pursuant to MCR 2.116(C)(7). The trial court dismissed the timely portion of the claim under MCR 2.116(C)(10) for Genesee's failure to demonstrate a genuine issue of material fact on the element of reliance.

## II. STANDARDS OF REVIEW

We review de novo the legal question of the applicability of a statute of limitations. *Parks v Niemiec*, 325 Mich App 717, 719; 926 NW2d 297 (2018). "Summary disposition under MCR 2.116(C)(7) is appropriate when the undisputed facts establish that the plaintiff's claim is barred under the applicable statute of limitations." *Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 21; 896 NW2d 39 (2016) (quotation marks and citations omitted).

> When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate. [*Id*. (citation omitted).]

"We review de novo the interpretation and application of a statute as a question of law. If the language of a statute is clear, no further analysis is necessary or allowed." *Eggleston v Bio-Med Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003) (citation omitted). We

also review de novo as a question of law issues regarding the existence and interpretation of a contract. *Myland v Myland*, 290 Mich App 691, 700; 804 NW2d 124 (2010). Unambiguous contractual language is enforced as written. *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008).

We also review de novo a trial court's decision regarding a motion for summary disposition under MCR 2.116(C)(10) which tests whether a claim is factually sufficient. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159-160; 934 NW2d 665 (2019).

> When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id*. at 160 (quotation marks and citations omitted).]

> A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint. When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone. A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery. [*Id*. at 159-160 (citations omitted, emphasis in original).]

### III. ANALYSIS

Genesee asserted multiple theories of liability before the trial court, all of which were rejected. For the reasons set forth below, we affirm the trial court.

### A. GENESEE'S CLAIMS REGARDING THE 2010 AND 2011 AUDIT

### 1. GENESEE'S ACCOUNTING MALPRACTICE CLAIMS AND THE TWO-YEAR STATUTE OF LIMITATIONS OF MCL 600.5805(8)

Genesee first argues that the trial court erred in ruling that the aspects of Genesee's malpractice claim pertaining to Yeo's actions or statements made before July 8, 2012, were barred by the applicable statute of limitations. We disagree.

Because Genesee had no client relationship with Yeo, it asserted an accountant malpractice claim based on alleged fraud or misrepresentation as permitted under MCL 600.2962(1) which in relevant part provides:

> (1) This section applies to an action for professional malpractice against a certified public accountant. A certified public accountant is liable for civil damages in connection with public accounting services performed by the certified public accountant only in 1 of the following situations:

> * * *

(b) An act, omission, decision, or conduct of the certified public accountant that constitutes fraud or an intentional misrepresentation.

Under MCL 600.5805(8), a two-year statute of limitations applies to professional malpractice actions, including accounting malpractice actions. *Levy v Martin*, 463 Mich 478, 482; 620 NW2d 292 (2001); *Ohio Farmers Ins Co v Shamie*, 243 Mich App 232, 236; 622 NW2d 85 (2000). MCL 600.5838(1) provides as follows regarding the accrual of a professional malpractice claim:

Except as otherwise provided in section 5838a or 5838b, a claim based on the malpractice of a person who is, or holds himself or herself out to be, a member of a state licensed profession accrues at the time that person discontinues serving the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

The accrual provision in MCL 600.5838(1) applies to claims of accounting malpractice. *Levy*, 463 Mich at 482-483; *Ohio Farmers Ins Co*, 243 Mich App at 238.

Genesee filed this action on July 8, 2014. Under MCL 600.5838(1), Genesee's claims against Yeo accrued at the time Yeo discontinued serving Flint. Genesee argues that its malpractice claim did not accrue until early 2013 because it contends that the professional relationship between Yeo and Flint ended then. Yeo and Flint, however, entered into yearly written engagement agreements that provided that Yeo's engagement for each year ended upon its delivery of the audit report for that year. Despite their engagement agreements, Genesee asserts that Yeo and Flint had a continuing services agreement that extended from the spring of 2008 until early 2013. We disagree.

In *Levy*, 463 Mich at 480-481, the defendants provided accounting services for the plaintiff from 1974 to 1996. In 1997, the plaintiff filed an action alleging malpractice on the part of the defendants respecting the plaintiff's 1991 and 1992 tax returns. *Id*. at 481. Our Supreme Court concluded that the parties had a continuing professional relationship that lasted until 1996 and that the plaintiff, therefore, timely filed its action in 1997. *Id*. at 485-487. Our Supreme Court explained that the defendants had failed to present evidence "that each income tax preparation was a discrete transaction that should be considered to separately constitute 'the matters out of which the claim for malpractice arose,' MCL 600.5838(1) . . . ." *Id*. at 489 n 19. Our Supreme Court clarified that "the result may have been different if defendants had come forward with documentary evidence that each annual income tax preparation was a discrete transaction that was in no way interrelated with other transactions." *Id*.

In this case, Yeo and Flint entered into yearly engagement agreements indicating that each annual audit constituted a discrete transaction that ended with the delivery of the annual audit report. In particular, the 2010 and 2011 engagement agreements each expressly stated:

Our engagement will end upon delivery of your audited financial statements and our report thereon for year set forth above. Any additional services that may be required will be part of a separate and new engagement. Should you wish to

engage us to prepare your audited financial statements for any other year, and should we accept such engagement, such engagement will be a separate and new engagement. A new engagement letter for any services beyond the scope of this engagement will govern the terms and conditions of the new engagement.

The terms of engagement lack ambiguity and plainly specify the termination of Yeo's engagement at the conclusion of its performance of the services specified in the engagement agreements. Therefore, as expressly contemplated in *Levy*, Yeo provided evidence that each annual audit constituted a discrete transaction. Because each year constituted a new and separate engagement under the terms specified in Yeo and Flint's annual engagement agreements, any claims for accounting malpractice accrued upon the end of each annual engagement. Accordingly, the two-year limitations period commenced upon the accrual of Genesee's claim when the professional relationship between Yeo and Flint ended upon Yeo's delivery of Flint's annual audited financial statements for each applicable year. Any accounting malpractice claim related to Yeo's services performed under the engagement agreements related to the audited financial statement and report Yeo delivered in 2010 and 2011 accrued upon delivery and the two-year limitations period elapsed in 2012 and 2013 respectively. Because Genesee filed this action on July 8, 2014, claims related to the audited financial statement and report Yeo delivered in 2010 and 2011 were time-barred because the two-year statute of limitations period had elapsed.

Genesee contends that, because Yeo provided additional accounting services at various times for Flint, a continuing services agreement existed. But Genesee's contention is belied by the unambiguous language of the yearly engagement agreements stating that the provision by Yeo of any additional services would be a separate and new engagement. Here, the yearly annual audits were the matters out of which Genesee's claim for malpractice arose, and those audits were discrete transactions under the terms of the separate annual engagement agreements.

Genesee also suggests that a continuing services agreement existed because of a March 14, 2008 document submitted by Flint's chief financial officer to the Flint Board of Education proposing the adoption of a resolution approving the retention of Yeo for auditing services "for fiscal years June 30, 2008-2010 with two, one-year renewal options . . . ." The record, however, indicates that Yeo did not sign that document, and there is no evidence establishing Yeo's assent to a continuing services agreement. "Where mutual assent does not exist, a contract does not exist." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372; 666 NW2d 251 (2003). By contrast, the yearly written engagement agreements were signed by representatives of both Yeo and Flint.

Accordingly, the trial court correctly ruled that the yearly audits constituted discrete transactions that comprised the matters out of which Genesee's malpractice claim arose. Because Genesee filed this action on July 8, 2014, the two-year statute of limitations barred claims of malpractice related to conduct or statements before July 8, 2012, including the 2010 and 2011 audit reports, absent the applicability of the fraudulent concealment exception to the statute of limitations, which is discussed below.

## 2. GENESEE'S FRAUDULENT CONCEALMENT CLAIMS EXCEPTION TO THE STATUTE OF LIMITATIONS UNDER MCL 600.5855

Genesee next argues that the otherwise untimely aspects of its malpractice claim are rendered timely by the fraudulent concealment exception to the statute of limitations. We disagree.

The fraudulent concealment exception to the statute of limitations is set forth in MCL 600.5855, which provides:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

"Fraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent." *Doe v Roman Catholic Archbishop of Archdiocese of Detroit*, 264 Mich App 632, 642; 692 NW2d 398 (2004) (quotation marks and citations omitted). "For a plaintiff to be sufficiently apprised of a cause of action, a plaintiff need only be aware of a possible cause of action." *Id*. at 643 (quotation marks and citation omitted). "Absent a fiduciary relationship, fraudulent concealment extends the applicable limitations period only when the defendant has made an affirmative act or representation." *Dillard v Schlussel*, 308 Mich App 429, 443; 865 NW2d 648 (2014). Mere silence does not establish fraudulent concealment. *Id*.

Genesee contends that, in addition to purported affirmative acts of misrepresentation, Yeo's mere silence in failing to disclose Flint's misappropriation of millage funds constituted an act of fraudulent concealment. That portion of Genesee's argument fails because there is no allegation or evidence of a fiduciary relationship between Yeo and Genesee. *Id*. Nor could such an allegation have succeeded, given that Yeo's client was Flint, not Genesee.

In support of its contention that Yeo's mere silence constituted fraudulent concealment, Genesee cites *Draws v Levin*, 332 Mich 447, 453; 52 NW2d 180 (1952), in which our Supreme Court quoted *Dowse v Gaynor*, 155 Mich 38, 43; 118 NW 615 (1908), for the proposition that when " 'the basis of the action is a fraud perpetrated by the defendant, the original fraud is regarded as a continuing affirmative act, and mere silence of the defendant is treated as a concealment.' " However, *Draws* was a medical malpractice case; there was no allegation of fraud as a cause of action. See *Draws*, 332 Mich at 450. The language in *Draws* upon which Genesee relies is thus nonbinding dictum. See *Mount Pleasant Pub Sch v Mich AFSCME Council 25*, 302 Mich App 600, 610 n 2; 840 NW2d 750 (2013) (dictum is a "judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (though it may be considered persuasive)[]").

Further, in *Dowse*, 155 Mich at 43-44, our Supreme Court upheld the trial court's determination that there was no evidence of fraud. *Dowse* involved an allegation of a fiduciary relationship between the parties, which our Supreme Court rejected. *Id*. at 40, 43. No fiduciary relationship between Yeo and Genesee is alleged and one does not exist here. Indeed, our Supreme Court has distinguished *Dowse* on this very ground. See *Int'l Union United Auto Workers of America v Wood*, 337 Mich 8, 13-14; 59 NW2d 60 (1953) ("Fraudulent concealment is more than mere silence. No fiduciary relationship existed between the Union and Wood, as was alleged and denied in [*Dowse*].") (citations omitted), superseded in part by statute on other grounds as stated in *Chandler v Wackenhut Corp*, 465 F Appx 425, 428 (CA 6, 2012). It is also notable that *Draws* and *Dowse* were decided before the enactment of the current fraudulent concealment statute. See *Hope-Jackson v Washington*, 311 Mich App 602, 617; 877 NW2d 736 (2015) (noting that the Legislature enacted MCL 600.5855 by 1961 PA 236, effective January 1, 1963). Accordingly, Genesee's argument that Yeo's mere silence constituted fraudulent concealment, despite the general requirement of an affirmative act of fraudulent concealment rather than mere silence, fails.

Genesee's argument for the applicability of the fraudulent concealment exception also fails for another reason. Respecting both Yeo's alleged silence as well as Yeo's purported affirmative acts of fraudulent concealment, Genesee's fraudulent concealment argument is unavailing because Genesee failed to file this action within two years after Genesee knew or should have known about a possible cause of action, as required by MCL 600.5855. Record evidence established that Genesee knew or should have known about its possible cause of action by December 2011 or January 2012, but it did not file this action until more than two years later, on July 8, 2014. The fraudulent concealment statute, therefore, does not render timely the portions of Genesee's claim pertaining to the 2010 and 2011 audits.

The evidence indicates that Genesee knew or should have known of a possible cause of action by December 2011 or January 2012. Yeo's audit report for Flint in 2011 combined the Skill Center fund with the general fund and did not expressly refer to the Skill Center fund. The MLive.com website reported on December 2, 2011, about improper accounting practices in relation to Flint's deficit. The alleged improper practices included "[l]ax record-keeping[,]" "[i]mproper use of grant money[,]", and "[i]nability to control future spending[,]" and the article stated that "Flint also has had a years-long deficit of $3 million in the K-12 fund, using surpluses in other funds to cover it." Although the MLive article did not expressly mention the Skill Center fund, ample other indicia during that time period exposed that Flint used Skill Center monies for general-fund purposes. Such information should have alerted Genesee about a possible connection to the improper accounting practices listed in the MLive article.

In an e-mail exchange on December 12, 2011, LaTanya Miller, the assistant of Chris James, the principal of the Skill Center, wrote to Genesee's superintendent, Dr. Lisa Hagel, stating that James requested an emergency meeting with Dr. Hagel regarding a December 9, 2011 Flint Board of Education meeting at which Flint's chief financial officer allegedly admitted that Flint had used the Skill Center's $5 million fund balance. Dr. Hagel responded to Miller by stating that James should first talk to Flint's superintendent, Linda Thompson. Dr. Hagel further wrote that "[w]e need to follow a process, and get the minutes as well as accurate information before anyone reacts emotionally and hurriedly."

In a December 21, 2011 e-mail exchange between Dr. Hagel and Thompson, Dr. Hagel made comments reflecting her knowledge that Flint had combined accounts because of Flint's deficit. Dr. Hagel wrote that "[p]eople are stating that" someone, possibly Flint's chief financial officer, said at the Flint Board of Education meeting that "the fund balance from skill center 'is gone' or has been spent. (not sure)[.]" Dr. Hagel further wrote that "[w]hen looking at the past budgets there was approximately 4 million dollars of [Skill Center] fund balance, this year I believe you were asked to combine accounts because of the deficit situation." Dr. Hagel also stated in this e-mail exchange that "we need to help Chris James understand exactly where we are so all have common responses and a plan of action."

On December 22, 2011, Frederic Stanley, Genesee's regional director of Career Technical Education, e-mailed Genesee's assistant superintendent of business, Cynthia McCain, stating that he thought it was "unethical" and "illegal" for Flint to use any of the Skill Center millage money for the operation of the Flint School District. Stanley suggested that Genesee should have an attorney look into the matter. In response to Stanley, and with a courtesy copy to Dr. Hagel, McCain indicated that Flint's accounting was proper and that Flint was "not using the money for the general fund since all activity is tracked in a special revenue account." Dr. Hagel then e-mailed McCain, stating, "If I understand correctly, Flint has also spent the [Skill Center] dollars which is why they are considered deficit, or is the almost 4 million dollars set aside somewhere?" McCain responded with an explanation of why she thought that Flint's accounting was proper. Dr. Hagel responded that she understood McCain's explanation but further asked, "[S]o are we seeing [Flint's] liabilities so high that they were actually 9 million in deficit, not 4.3?" McCain confirmed that Dr. Hagel was correct.

Dr. Hagel testified that, just before the 2011 Christmas break, she asked Thompson to explain the 2011 audit so that Dr. Hagel could understand the status of the Skill Center funds. In January 2012, Thompson met with Dr. Hagel and explained that Michael Frawley, Yeo's primary accountant for Flint during the relevant time period, had told her that the 2011 audit report was prepared in a different manner because of changes in auditing rules. In response to Thompson's explanation, Dr. Hagel "said that's all fine, but I need documents from your auditor that show where the cash is and where the fund balance is[.]" Thompson responded by having an assistant send audit documents to Dr. Hagel. According to Dr. Hagel, Thompson used "those financial statements from the auditor" to convince Dr. Hagel that the Skill Center funds were available. The audit documents that were sent to Dr. Hagel were 2011 Skill Center balance sheets, which had not been attached to the 2011 audit report. James's assistant, Miller, sent the 2011 Skill Center balance sheets to Dr. Hagel.[1]

On January 26, 2012, Dr. Hagel presided at a meeting of the Skill Center's administrative council. At that meeting, Jennifer Gibson-Lamb, a document control specialist for the Skill Center,

---

[1] Notably, Thompson served as Flint's superintendent, not as an agent of Yeo. Although Genesee claims that Thompson used financial documents, i.e., Skill Center balance sheets that had allegedly been prepared by Yeo in order to convince Dr. Hagel that the Skill Center funds were available, there is no evidence that Yeo intended for Genesee to receive or rely on such documents or for Thompson to use them to allegedly convince Dr. Hagel that all was well.

expressed concerns about Flint's mismanagement of Skill Center monies. Gibson-Lamb's comments at this meeting were based on her review of the 2011 audit report for Flint. In particular, Gibson-Lamb expressed her view that Flint had inappropriately commingled Skill Center monies with Flint's general fund.

Considering all of the evidence together, Genesee knew that Flint had combined the general fund and the Skill Center fund. Genesee also knew that Flint's deficit had been vastly understated. Further, the 2011 audit report showed that Flint's general fund had no cash. In fact, Genesee's own expert in school auditing, Patricia Duperron, testified that the Skill Center obviously had no cash available given the combination of the Skill Center fund with the general fund and the lack of any cash in Flint's general fund. Despite any alleged false assurances that Genesee received from Flint or Yeo, Genesee had more than enough information to inform it that Flint used Skill Center funds for general-fund purposes.[2] Genesee, therefore, knew or should have known of a possible cause of action by January 2012. But Genesee did not file this action until more than two years later, on July 8, 2014. Because Genesee did not file this action within two years after Genesee knew or should have known of a possible cause of action, Genesee's claim pertaining to the 2010 and 2011 audits is not rendered timely by the fraudulent concealment exception to the statute of limitations under MCL 600.5855.[3]

## B. GENESEE'S CLAIMS REGARDING THE 2012 AUDIT

Genesee next argues that the trial court erred in granting summary disposition to Yeo respecting the portion of Genesee's malpractice claim regarding the 2012 audit report on the ground that Genesee failed to demonstrate the existence of a genuine issue of material fact respecting the reliance element of its claim. We disagree.

Genesee bases its malpractice claim against Yeo, on alleged fraud or misrepresentation, under MCL 600.2962(1)(b). In *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 38-39; 761 NW2d 151 (2008) (citations omitted), this Court stated the requisite elements of a fraud claim as follows:

---

[2] Genesee relies for its fraudulent concealment argument on McCain's claim that Frawley had assured her on December 19, 2011, that the Skill Center monies were separately maintained and available. Even assuming that Frawley made such an assertion, it does not eliminate the numerous other indicia regarding Flint's use of Skill Center money to hide its deficit and for general-fund purposes, including information provided after McCain's December 19, 2011 conversation with Frawley, such as Gibson-Lamb's remarks in January 2012.

[3] Yeo speculates that Genesee failed to take any action until later, after public attention had focused more sharply on the Skill Center funding issue, because Genesee itself profited from the misuse of millage money, including by using Skill Center millage funds to pay off unrelated debts owed by Flint to Genesee. We decline to engage in such speculation or to determine Genesee's motive or reason for failing to address this matter sooner because it lacks relevance to the issue of when Genesee had enough information to know or when it should have known of a possible cause of action which evidence establishes was more than two years before Genesee filed this action.

To establish a prima facie case of fraud, a plaintiff must prove that (1) the defendant made a material representation, (2) the representation was false, (3) the defendant knew that it was false when it was made, or made it recklessly, without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intention that the plaintiff would act on it, (5) the plaintiff acted in reliance on it, and (6) the plaintiff suffered injury because of that reliance. This Court has frequently reiterated that, to sustain a fraud claim, the party claiming fraud must reasonably rely on the material misrepresentation.

Reliance exists if the "misrepresentation exerted a material influence upon the minds of (the complainants), although it might be only 1 of several motives, acting together, which produced the result." *United States Fidelity and Guaranty Co v Black*, 412 Mich 99, 121; 313 NW2d 77 (1981) (quotation marks and citation omitted).

In this case, Genesee produced no evidence demonstrating a genuine issue of material fact regarding whether it acted in reasonable reliance on alleged misrepresentations in the 2012 audit report. In fact, the evidence established that Genesee did not rely on the 2012 audit report.

On November 14, 2012, the very day that Yeo sent the 2012 audit report to Genesee's business services administrator, Frawley attended a public meeting of the Flint Board of Education at which he acknowledged that the Skill Center monies had concealed the true size of Flint's general fund deficit. MLive reported that evening that Flint's purported $4 million deficit was actually more like $11 million, and that several board members and Frawley said that the "budget for the Genesee Area Skill Center is, and has for years, concealed a larger deficit in the district's K-12 general fund[.]"

On November 15, 2012, Thompson announced her resignation as Flint's superintendent in a letter that addressed the controversy regarding the Skill Center fund as follows:

> I must also address the accusations flying regarding the Skill Center. For starters, the Skill Center budget has **always** been a part of the entire Flint Community Schools budget. Its fund balance has always been included in the district's bottom line. It has contributed to the district's fund balance and has helped carry the district's budget. And, yes, it has been their frugality that has prolonged the inevitable outcome of years of budgets that were out of line with the district's realities. I assure all of you there has been no wrongdoing, whatsoever.

Dr. Hagel testified that, on the basis of Thompson's statements in her resignation letter, as well as Frawley's comments at the Flint Board of Education meeting as reported by MLive, it became clear that Genesee had been defrauded out of the Skill Center monies.[4]

---

[4] Although Genesee emphasizes that Dr. Hagel claimed to have reached her conclusion about being defrauded toward the end of November 2012, Dr. Hagel also admitted that "as soon as November 15th, Superintendent Thompson submitted her resignation. In that resignation letter,

Despite learning this information, Genesee chose to keep sending Skill Center millage money to Flint until June 2013. At a March 14, 2016 hearing in this case, the trial court asked Genesee's counsel about Genesee's decision to continue sending funds to Flint well into 2013:

> *The Court*: Did [Genesee] forward any money to City of Flint Schools for the skill center in 2013?
>
> *Mr. Hubbard* [Genesee's counsel]: They did. If I could—
>
> *The Court*: Could I ask you just as a curiosity?
>
> *Mr. Hubbard*: Absolutely.
>
> *The Court*: Why in the world would they do that?
>
> *Mr. Hubbard*: That's a fair question, and I think we've got a pretty good answer.
>
> *The Court*: Okay. I'm listening.
>
> *Mr. Hubbard*: So, consider the situation where Dr. Hagel finally appreciates that Flint School District and Yeo and Yeo have bilked [Genesee] for $8.6 million. Consider the situation where they finally realize that despite the fact that they've been telling you that there's $8.6 million, they have zero cash, nothing. So, Dr. Hagel's put in the position of what does she do, not pay the teachers? They're living week to week. So, consider the situation if she automatically stops payment to Flint School District, what happens then? The teachers don't show up to work.
>
> *The Court*: Well, it was noble. It might have been noble, but it certainly can't be called reliance on fraud, can it?
>
> *Mr. Hubbard*: No, but it's a damages issue, and we're going after every last dollar and cent, Your Honor . . . .

In sum, the evidence indicates that Genesee did not rely on the 2012 audit report. On the very day that Yeo sent the 2012 audit report to Flint, Frawley disclosed at a public meeting the manner in which Flint used the Skill Center funds, which local media reported. The Thompson resignation letter the next day further informed Genesee of Flint's handling of the funds. The evidence established that Genesee did not act in reliance on the 2012 audit report. Genesee sought to evade summary disposition based upon submission of a conclusory assertion of reliance in Dr.

---

there was a paragraph that completely contradicted everything that she had been sharing with the superintendent's group." Dr. Hagel further testified that "[t]here was an M-Life [sic] article that came out that day that Mr. Frawley admitted that Flint had spent the Skill Center monies that were supposed to be restricted in its own account just for [the Skill Center]."

Hagel's affidavit. Because such assertion conflicted with evidence of Genesee's historical conduct, such conclusory assertions did not establish the reliance element of Genesee's claim. See *Bergen v Baker*, 264 Mich App 376, 389; 691 NW2d 770 (2004) (noting that "summary disposition cannot be avoided by a party's conclusory assertions in an affidavit that conflict with the actual historical conduct of the party[]").

As for Genesee's contention that it relied on the 2012 audit report to initiate a disbursement of funds to Flint on November 14, 2012, Genesee admits that it did not issue a check to Flint until November 16, 2012, after the release of the Thompson resignation letter and the MLive article that reported Frawley's comments at the November 14, 2012 Flint Board of Education meeting. Genesee offers no reason why it could not have halted the disbursement. Because Genesee failed to show the existence of a genuine issue of material fact regarding any reliance on the 2012 audit report, the trial court properly granted summary disposition to Yeo on the part of Genesee's claim pertaining to the 2012 audit report.

## C. GENESEE'S CLAIMS SEEKING A DEFAULT JUDGMENT BECAUSE OF THE SPOLIATION OF EVIDENCE

Genesee next argues that the trial court erred in denying Genesee's request for a default judgment as a sanction for Yeo's spoliation of evidence. We disagree.

This Court reviews for an abuse of discretion a trial court's decision whether to grant a default judgment as a sanction for alleged discovery abuses. *Kalamazoo Oil Co v Boerman*, 242 Mich App 75, 89; 618 NW2d 66 (2000). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

MCR 2.313(B) allows a trial court to impose various sanctions, including entry of a default judgment, when a party violates a discovery order. *Kalamazoo Oil Co*, 242 Mich App at 86.

> However, [a default judgment] is a drastic measure and should be used with caution. Before imposing the sanction of default judgment, the trial court should consider whether the failure to respond to discovery requests extends over a substantial period, whether there was a court order directing discovery that was not complied with, the amount of time that elapsed between the violation and the motion for default judgment, and whether willfulness has been shown. The court should also evaluate other options before concluding that a drastic sanction is warranted. The sanction of default judgment should be employed only when there has been a flagrant and wanton refusal to facilitate discovery and not when failure to comply with a discovery request is accidental or involuntary. [*Mink v Masters*, 204 Mich App 242, 244; 514 NW2d 235 (1994) (citations omitted).][5]

---

[5] See also *Swain v Morse*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 346850), slip op at 4 (explaining that the imposition of severe sanctions "such as default or dismissal are

Also, a trial court has inherent authority "to sanction a party for failing to preserve evidence that it knows or should know is relevant before litigation has commenced." *Brenner v Kolk*, 226 Mich App 149, 160; 573 NW2d 65 (1997).

> [I]n a case involving the failure of a party to preserve evidence, a trial court properly exercises its discretion when it carefully fashions a sanction that denies the party the fruits of the party's misconduct, but that does not interfere with the party's right to produce other relevant evidence. An appropriate sanction may be the exclusion of evidence that unfairly prejudices the other party or an instruction to the jury that it may draw an inference adverse to the culpable party from the absence of the evidence. [*Id*. at 161 (citations omitted).]

In this case, the trial court acted within its discretion in concluding that Yeo's conduct did not warrant the imposition of a default judgment. The record reflects that Yeo provided evidence that indicated that it unintentionally failed to preserve the e-mails at issue. Thomas Hollerback, Yeo's chief executive officer, testified that, shortly after Genesee served its complaint on Yeo in July or August of 2014, he directed his assistant, Cathy Hammis, to instruct Yeo's information technology department to put a litigation hold on the routine destruction of Yeo's e-mails. Hammis likewise testified that Hollerback told her to instruct the information technology department to institute a litigation hold. Hammis testified that she communicated Hollerback's instruction to the information technology department. Hammis believed that after she conveyed this instruction the information technology department implemented a litigation hold. Lyle Behmlander, the senior systems engineer in Yeo's information technology department, testified that he did not recall receiving a request for a litigation hold in 2014; he implemented a litigation hold around the spring of 2016 in response to a request from Hammis. Had a litigation hold been implemented in 2014, e-mails dating back two years, i.e., to 2012, would have been preserved. Because Yeo's information technology department did not institute the litigation hold until 2016, only e-mails dating back to 2014 existed because of Yeo's record retention policy.

At the hearing on Genesee's motion for entry of a default judgment or for other discovery sanctions, the trial court referred to the record testimony and stated, "If in fact that is accurate, doesn't that right there take it out of the intentional destruction of evidence realm that might prompt a default and maybe there's some other remedy?" The trial court remarked that an appropriate remedy would be to permit the trial court as the trier of fact in this case to draw an inference that the destroyed e-mails would have been adverse to Yeo. At the conclusion of the hearing, the trial court stated that it would issue a written decision. The trial court, however, did not formally issue a written decision on Genesee's motion until the court entered its May 2, 2018 order granting summary disposition to Yeo. In that order, the trial court denied all remaining motions in the case as moot. After Genesee's motion for reconsideration challenged that mootness determination, the trial court addressed this issue again in its August 22, 2018 order denying Genesee's motion for

---

predicated on a flagrant or wanton refusal to facilitate discovery that typically involves repeated violations of a court order." Further, because a trial court's "inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Id*. at 5 (quotation marks and citation omitted)).

reconsideration. The trial court stated, "While it is true that it was agreed upon that [Genesee] would be entitled to an adverse instruction at trial regarding missing e-mails, the issue is moot because the Court has determined that there no longer exists a cause of action." The trial court further explained:

> The Court has already found [Genesee's] fraudulent misrepresentation claim to be deficient, considering all of the extensive discovery that has already been conducted by the parties. Therefore, [Yeo's] alleged intent is moot. While it is true that the trial court should draw the adverse inference when ruling on the summary disposition motion, that adverse inference does not magically create additional evidence required to establish the elements for this cause of action. The Court rejects this argument.

In a footnote, the trial court added that Genesee's "gross over-characterization of the egregiousness of [Yeo's] spoliation does not save this argument for them."

The trial court's refusal to enter a default judgment as a sanction for Yeo's failure to preserve certain e-mails fell within the range of reasonable and principled outcomes. The deposition testimony presented by Yeo supported the conclusion that Yeo did not intentionally destroy evidence; rather, the failure to institute a timely litigation hold on the routine destruction of e-mails appears to have resulted from some type of mistake or miscommunication among Yeo employees. To be sure, Yeo should have exercised better practices to ensure the preservation of evidence, and Yeo's attorneys would have been well advised to take more active steps to ensure that a litigation hold got implemented from the outset of the case. But there does not appear to have been a flagrant or wanton refusal to facilitate discovery. The record did not establish that Yeo intentionally spoiled evidence. The trial court, therefore, did not abuse its discretion by not imposing the harsh sanction of entry of a default judgment against Yeo. The circumstances of this case did not warrant such penalty.

The trial court also did not err by concluding, after properly determining that no genuine issue of material fact existed that Genesee failed to establish its prima facie case against Yeo, that the other pending motions were rendered moot by its ultimate decision. Even though the trial court agreed that an adverse inference could be drawn against Yeo respecting the missing e-mails, that adverse inference would not have established the elements of Genesee's malpractice claim based on fraud because the evidence actually established that Genesee did not rely on Yeo's conduct or representations in the audit reports.

### D. GENESEE'S CHALLENGE TO THE GRANT OF SUMMARY DISPOSITION IN FAVOR OF YEO IN LIGHT OF THE SPOLIATION OF EVIDENCE

Genesee next challenges the trial court's summary disposition ruling by arguing that the trial court should have drawn an adverse inference when ruling on the summary disposition motions, given Yeo's spoliation of evidence and the trial court's remarks that an adverse inference at trial would serve as an appropriate sanction. Genesee's argument fails because an adverse inference against Yeo at the summary disposition stage would not have helped Genesee evade summary disposition.

Genesee concedes that neither this Court nor the Michigan Supreme Court has held that the discovery sanction of an adverse inference should be applied at the summary disposition stage. But Genesee argues that a concurring opinion of a Michigan Supreme Court justice as well as a lower federal court opinion support the view that an adverse inference should be applied in the summary disposition context. See *Banks v Exxon Mobil Corp*, 477 Mich 983, 984; 725 NW2d 455 (2007) (KELLY, J., concurring) (noting that the issue is one of first impression and opining that an adverse inference should be considered at the summary disposition stage); *Clay v United Parcel Serv, Inc*, 501 F3d 695, 716 (CA 6, 2007) (stating that an adverse inference should have been drawn at the summary judgment stage).[6]

We are not persuaded that drawing an adverse inference at the summary disposition stage in this case would have led to a different disposition of this case. When ruling on a summary disposition motion, the trial court must view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. See generally, *El-Khalil*, 504 Mich at 160; *Gomez*, 318 Mich App at 21. Even if the trial court would have drawn an adverse inference in this case, such evidence would not establish Genesee's prima facie case of fraud because the evidence undermined Genesee's assertion that it ever relied on the audit reports.

Even if spoliation of evidence entitled Genesee to have an adverse inference considered at the summary disposition stage, this would not have helped Genesee evade summary disposition in favor of Yeo. Genesee repeatedly argued below that the missing e-mails were critical to establishing Yeo's fraudulent intent or knowledge regarding Flint's alleged financial improprieties. But the trial court granted summary disposition to Yeo on grounds unrelated to Yeo's knowledge and intent. Respecting the 2012 audit report, the trial court granted Yeo summary disposition on the ground that Genesee did not rely on any misrepresentations in the 2012 audit report. The trial court dismissed as untimely the portion of Genesee's claim pertaining to the 2010 and 2011 audit reports because of the elapse of the statute of limitations. Accordingly, given these rationales for granting summary disposition to Yeo, drawing an adverse inference regarding Yeo's knowledge or intent because of Yeo's spoliation of evidence would not have helped Genesee evade summary disposition.

### E. GENESEE'S CLAIMS BASED ON AN AIDING AND ABETTING THEORY OF FRAUD

Genesee next argues that the trial court erred in granting Yeo summary disposition of its claim for aiding and abetting fraud. Specifically, Genesee argues that the trial court erred in concluding that no cause of action for aiding and abetting fraud exists under Michigan common law. We disagree.

The Michigan Supreme Court "is the principal steward of Michigan's common law." *Henry v Dow Chemical Co*, 473 Mich 63, 83; 701 NW2d 684 (2005). Although our Supreme Court has on occasion allowed for the development of the common law as warranted by circumstances and considerations of public policy, it nonetheless seeks "to avoid capricious

---

[6] Decisions of lower federal courts are not binding on this Court but may be persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences[.]" *Id*. (quotation marks and citation omitted). Our Supreme Court has noted that judicial recognition of a new cause of action may sometimes "have undesirable effects that neither [our Supreme Court] nor the parties can satisfactorily predict." *Id*. The decision whether to expand the common law to create a new cause of action therefore cannot occur in the absence of a careful weighing of the relative benefits and burdens of such a decision. *Id*. at 84.

Our Supreme Court has never recognized a cause of action for aiding and abetting fraud, nor has our Supreme Court ever held that the phrase "aiding and abetting" may be placed in front of any tort to create a cause of action for aiding and abetting that tort. Genesee seeks to rely on *Brink v Purnell*, 162 Mich 147, 149-150; 127 NW 322 (1910), which upheld a trial court's instruction that a defendant could be liable if he counseled, instigated, aided, and abetted in the assault upon the plaintiff. *Brink*, however, did not create a cause of action for aiding and abetting fraud or for aiding and abetting torts generally. Genesee cites caselaw recognizing a cause of action for aiding and abetting certain specific torts. See, e.g., *Prime Fin Servs, LLC v Vinton*, 279 Mich App 245, 276; 761 NW2d 694 (2008) (stating that the defendant could be liable for aiding and abetting conversion). None of the cited cases, however, hold that aiding and abetting fraud constitutes a cognizable cause of action under Michigan law. And although a lower federal court has suggested that our Supreme Court might someday allow claims for aiding and abetting tortious conduct, see *El Camino Resources, Ltd v Huntington Nat'l Bank*, 712 F3d 917, 922 (CA 6, 2013), our Supreme Court has not done so.[7] No binding Michigan authority has recognized a cause of action for aiding and abetting fraud, and Genesee has provided no analysis of the benefits and burdens associated with expanding the common law to create such a cause of action. Genesee's argument on this issue therefore fails.

Further, the trial court reached the correct result for another reason.[8] Genesee's claim for aiding and abetting fraud is precluded by MCL 600.2962(1), which limits the circumstances in which a certified public accountant may be liable for civil damages in connection with public accounting services. MCL 600.2962(1)(b) allows a claim for fraud or intentional misrepresentation. No provision of MCL 600.2962 permits assertion of claim of aiding and abetting fraud. We conclude that Genesee's claim for aiding and abetting fraud is barred by MCL 600.2962. The trial court, therefore, did not err by granting Yeo summary disposition of Genesee's aiding and abetting fraud claim.

---

[7] The *El Camino* court noted that "[t]he Michigan Supreme Court has never expressly recognized a common-law claim for aiding and abetting tortious conduct." *El Camino*, 712 F3d at 922.

[8] This Court "will affirm a trial court's decision on a motion for summary disposition if it reached the correct result, even if [this Court's] reasoning differs." *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 449; 886 NW2d 445 (2015).

-16-

## F. GENESEE'S REPEATED REQUESTS TO AMEND THEIR COMPLAINT

Genesee next argues that the trial court erred in denying Genesee's repeated requests to amend its complaint to add claims for common-law fraud and aiding in the concealment of converted or embezzled property under MCL 600.2919a(1)(b). We disagree.

We review for an abuse of discretion a trial court's denial of a motion to amend a complaint. *Tierney v Univ of Mich Regents*, 257 Mich App 681, 687; 669 NW2d 575 (2003). "A trial court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes." *Andreson v Progressive Marathon Ins Co*, 322 Mich App 76, 83; 910 NW2d 691 (2017) (citation omitted).

After an initial 14-day period at the outset of the case, "a party may amend a pleading only by leave of the court or by written consent of the adverse party. Leave shall be freely given when justice so requires." MCR 2.118(A)(2). "[I]n ordinary cases, motions to amend are generally granted." *Diem v Sallie Mae Home Loans, Inc*, 307 Mich App 204, 216; 859 NW2d 238 (2014). Nevertheless, a motion to amend the complaint may be denied for the following reasons:

> (1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the opposing party by virtue of allowance of the amendment, or (5) futility of the amendment. Absent bad faith or actual prejudice to the opposing party, delay, alone, does not warrant denial of a motion to amend. [*Id.* (citation omitted).]

"A trial court has the inherent authority to control its own docket." *Baynesan v Wayne State Univ*, 316 Mich App 643, 651; 894 NW2d 102 (2016). A trial court may thus decline to entertain a motion to amend pleadings if it is filed after a court-imposed deadline. *Kemerko Clawson, LLC v RXIV, Inc*, 269 Mich App 347, 350-352; 711 NW2d 801 (2005).

In its August 14, 2015 order regarding Genesee's first motion to amend the complaint regarding Yeo, the trial court ruled that "any amended claims for aiding and abetting liability on the part of [Yeo] are without legal support, are therefore futile and [Genesee's] effort to add those claims to this lawsuit is denied." The trial court permitted Genesee to pursue only a fraud-based claim under MCL 600.2962(1)(b). The trial court further stated that "it is ONLY on this basis that [Genesee] may maintain a cause of action against [Yeo]. No other request to amend the complaint is allowed." Genesee nonetheless repeatedly sought to amend the complaint again to add the claims that the trial court had declined to allow in its August 14, 2015 ruling. The trial court's denial of these serial attempts to make the same arguments previously rejected were well within the trial court's authority to manage its docket.

Further, the trial court properly denied Genesee's request to amend the complaint to add claims of common-law fraud and aiding in the concealment of converted or embezzled property under MCL 600.2919a(1)(b) because such proposed amendments were futile. Genesee's proposed theories for relief did not fall within the limited claims permitted under MCL 600.2962(1) against certified public accountants in connection with public accounting services.

Genesee argues that MCL 600.2962(1) applies only to malpractice actions against certified public accountants, given that the first sentence of the provision states, "This section applies to an action for professional malpractice against a certified public accountant." Genesee reasons that its proposed new claims for common-law fraud and for aiding in the concealment of converted or embezzled property are not malpractice claims and thus are not barred by MCL 600.2962(1). The second sentence of MCL 600.2962(1), however, provides, "A certified public accountant is liable for civil damages in connection with public accounting services performed by the certified public accountant **only** in 1 of the following situations: . . . ." (emphasis added). The plain language of the second sentence strictly limits the circumstances in which a certified public accountant may be held liable for civil damages in connection with public accounting services and is not restricted to malpractice actions. It follows that only the specific types of claims set forth in MCL 600.2962(1) are allowed against a certified public accountant in connection with public accounting services.

MCL 600.2962(1)(b) provides that a certified public accountant may be held liable for civil damages for fraud in connection with public accounting services. This Court has explained that "fraud is distinct from malpractice." *Brownell v Garber*, 199 Mich App 519, 532; 503 NW2d 81 (1993). Therefore, if MCL 600.2962 applied only to malpractice actions, it would have been unnecessary for MCL 600.2962(1)(b) to allow for a fraud claim in connection with public accounting services. In other words, given that a fraud claim differs from a malpractice claim, a statute that provided only malpractice claims would not need to make an exception for fraud claims. This Court "should avoid a construction that would render any part of the statute surplusage or nugatory." *Duffy v Mich Dep't of Natural Resources*, 490 Mich 198, 215; 805 NW2d 399 (2011) (quotation marks and citation omitted). We conclude that MCL 600.2962(1) bars any legal action against a certified public accountant in connection with public accounting services unless the claim falls within one of the categories of claims specified in the statute. The trial court, therefore, properly denied Genesee's motions to amend. Genesee's proposed amendments were futile because Genesee's proposed new claims were not permitted under MCL 600.2962(1).

Yeo presents additional arguments for concluding that Genesee's proposed claim for aiding in the concealment of converted or embezzled property under MCL 600.2919a(1)(b) were futile. We decline to address them as unnecessary for the disposition of Genesee's appeal because the trial court did not abuse its discretion by denying Genesee's requests for leave to amend its complaint.

## IV. CONCLUSION

For the reasons set forth above, the trial court is affirmed.

/s/ James Robert Redford
/s/ Patrick M. Meter
/s/ Colleen A. O'Brien